IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

CHARLES JOHN BYRNE,

                Plaintiff,          Case No. 3:09 CV 919

-vs-

                                   MEMORANDUM, OPINION

CSX TRANSPORTATION, INC., et al.,

                Defendant.

KATZ, J.

Defendants CSX Transportation, Inc., Gerald Horn, and Alphonse Ducre, III, have renewed their motion for summary judgment, filed pursuant to Federal Rule of Civil Procedure 56(a). (Doc. No. 185). The Plaintiffs, Charles Byrne and Cody Byrne have filed a response (Doc. No. 193), and the Defendants have filed a reply. (Doc. No. 195).

## I. Facts

The undisputed facts establish that on May 19, 2008, Charles Byrne was traveling westbound on Ulsh Road in Caledonia, Ohio, with his son Cody Byrne. *Byrne v. CSX Transp., Inc.*, 541 F. App'x 672, 673 (6th Cir. 2013). A railroad crosses Ulsh Road at a twenty degree angle. *Id*. As the Byrne's car was crossing the tracks, a train struck the car on the rear end of the passenger side, flipping it over. *Id*. Cody Byrne sustained minor injuries. *Id*. However, Charles Byrne suffered permanent, disabling injuries. *Id*. Horn was the engineer and Ducre was the conductor of the train at the time of the collision. *Id*.

Plaintiffs filed this action in the Court of Common Pleas for Marion County, Ohio in March of 2009, seeking damages for injuries resulting from the collision. *Id*. at 673–74. The Defendants removed the case to this Court on the basis of diversity jurisdiction. *Id*. at 674.

On September 13, 2010, Defendants filed a motion for summary judgment arguing, in part, that the Plaintiffs' inadequate warning claim was preempted because the railroad was upgraded or improved using federal funds. *Id*. To support their proposition that federal funds were used on the railroad, the Defendants cited the "Kirkland Affidavit." *Id*. However, the Kirkland Affidavit was missing from the record and the Defendants admitted on appeal the affidavit was never filed. *Id*. In their response to Defendants' motion for summary judgment, the Plaintiffs conceded that "[a]ssuming that the railroad proves that the Ulsh Rd. crossing was installed using federal funds, Plaintiff[s] understand[ ] that in general the concept of conflict preemption will preclude a party as a matter of law from arguing that the warning devices at a crossing are inadequate." *Id*.

On April 26, 2011, this Court granted in part, and denied in part, Defendants' motion for summary judgment. *Id*. This Court found that it was undisputed that Plaintiffs' inadequate warning claims were preempted by federal law and did not fall within an exception. *Id*. The Court dismissed Plaintiffs' adequate warning and related punitive damages claims. *Id*. The matter proceeded to trial on the remaining issues and this Court entered judgment as a matter of law in favor of Defendants on May 31, 2012. On appeal, the Sixth Circuit reversed on the federal preemption issue and remanded the case for further proceedings because the Kirkland Affidavit had not been filed with this Court. *Id*. at 674, 678.

## II. Summary Judgment Standard

Summary judgment is proper where "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting a genuine issue of material fact must support the argument either by "citing to particular

parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The Court views the facts in the record and reasonable inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The Court does not weigh the evidence or determines the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The party requesting summary judgment bears an initial burden of demonstrating that no genuine issue of material fact exists, which the party must discharge by producing evidence to demonstrate the absence of a genuine issue of material fact or "by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25 (1986) (internal quotation marks omitted). If the moving party satisfies this burden, the nonmoving party "may not rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren,* 578 F.3d 351, 374 (6th Cir. 2009) (citing Rule 56 and *Matsushita,* 475 U.S. at 586). The party opposing the summary judgment motion must present sufficient probative evidence supporting its claim that disputes over material facts remain; evidence that is "merely colorable" or "not significantly probative" is insufficient. *Anderson,* 477 U.S. at 248–52.

III. Discussion

The Defendants are entitled to summary judgment as a matter of law. The record shows that the State of Ohio created an experimental program called the Ohio Buckeye Crossbuck Program. The Sixth Circuit described the program as follows:

3

> In 1993, the Ohio Department of Transportation ("ODOT") submitted a proposal to the U.S. Department of Transportation, Federal Highway Administration ("FHWA") to study the effectiveness of a new, experimental Buckeye Crossbuck in reducing accidents at public, passive grade crossings in Ohio. Based on this proposal, ODOT developed the Ohio Buckeye Crossbuck Program (the "Program"), a federally funded program intended to evaluate new crossbuck designs and to improve grade crossings. Funded 100% by the federal government, the Program involved the installation of either an upgraded Standard Crossbuck or an experimental Buckeye Crossbuck.
>
> Under the Program, Buckeye Crossbucks were placed at passive crossings bearing even numbered DOT identification numbers while upgraded Standard Crossbucks were installed at passive crossings with odd numbered DOT identification numbers. Standard Crossbucks are black-and-white X-shaped signs that read "RAILROAD CROSSING." The upgraded Standard Crossbucks were reflectorized. The Buckeye Crossbuck is a Standard Crossbuck with red lettering, reflective tape on the blades, reflective sheeting on all four sides of the post, and a new sign mounted on the crossbuck's post which read "YIELD" in red lettering and a white background.
>
> Later in 1993, CSXT and the State of Ohio entered into an agreement to cooperate in a demonstration project to evaluate the relative safety improvements generated by the new Buckeye Crossbuck versus an upgraded Standard Crossbuck. Under the agreement, CSXT was "to provide all labor, equipment, tools and materials" to install the crossbucks at all passively guarded CSXT grade crossings in the State of Ohio but would be fully reimbursed by the state. The State of Ohio received the funding by which it reimbursed CSXT pursuant to the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"). Following the installation of the crossbucks under the agreement, CSXT became the owner of the crossbucks and was required to "maintain them in good condition, as required by statute at company cost and expense."

*Nye v. CSX Transp., Inc.*, 437 F.3d 556, 559–60 (6th Cir. 2006).

Plaintiffs previously conceded that if the railroad proves that the Ulsh Road crossing was installed using federal funds, they are precluded as a matter of law from arguing that the warning devices at the crossing are inadequate. *Byrne*, 541 F. App'x at 674. This concession is based upon the Supremacy Clause of the United States Constitution which authorizes federal law to preempt conflicting state law. U.S. Const. art. VI, cl. 2. However, the intent to preempt state law must be "the clear and manifest purpose of Congress." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658,

4

663–64 (1993). The Supreme Court has noted that Congress can express its intent to preempt state law through explicit statutory language or implicitly through the statute's structure and purpose. *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992); *Nye*, 437 F.3d at 560.

In 1970, Congress enacted the Federal Railroad Safety Act (FRSA) "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101; *Nye*, 437 F.3d at 560. The FRSA conferred upon the United States Secretary of Transportation the authority to preempt state law relating to railroad crossing safety. *See Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 347 (2000). The express preemption provision of the FRSA provides for uniformity of law between the states to enact railroad safety laws until the Secretary of Transportation, through the Federal Highway Administration (FHWA), addresses the issue. 49 U.S.C. § 20106; *see also Nye*, 437 F.3d at 561.

Enacted in 1973, the Highway Safety Act created the Federal Railway-Highway Crossings Program to provide funding for the "cost of construction projects for the elimination of hazards of railway-highway crossings." 23 U.S.C. § 130(a); *Nye*, 437 F.3d at 561. The Secretary of Transportation addresses the adequacy of warning devices for railway crossings in 23 C.F.R. §§ 646.214(b)(3) and (b)(4). *Nye*, 437 F.3d at 561.

In *Shanklin*, the Supreme Court resolved the question of whether 23 C.F.R. §§ 646.214(b)(3) and (b)(4) preempted state tort law claims for failure to maintain adequate warning devices at railroad crossings. *Shanklin*, 529 U.S. at 352. The Court stated that the scope of the regulations applies to "any project where Federal aid funds participate in the installation of the devices." *Id*. at 354 (citing 23 C.F.R. § 646.214(b)(3)(i)). The Court held:

> Sections 646.214(b)(3) and (4) therefore establish a standard of adequacy that "determine[s] the devices to be installed" when federal funds participate in the crossing improvement project. [*CSX Transp., Inc. v.*] *Easterwood*, 507 U.S. [658,] 671[(1993)]. If a crossing presents those conditions listed in (b)(3), the State must install automatic gates and flashing lights; if the (b)(3) factors are absent, (b)(4) dictates that the decision as to what devices to install is subject to FHWA approval. *See id*. at 670–671. In either case, § 646.214(b)(3) or (4) "is applicable" and determines the type of warning device that is "adequate" under federal law. As a result, once the FHWA has funded the crossing improvement and the warning devices are actually installed and operating, the regulation "displace[s] state and private decision making authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained." *Id*. at 670.

*Shanklin*, 529 U.S. at 354 (some citations omitted).

In addressing the Ohio Buckeye Crossbuck Program in *Nye*, the Sixth Circuit held:

> It is indisputable that the Program was federally funded by the FHWA and ISTEA [Intermodal Surface Transportation Efficiency Act of 1991]. Most significant is the fact that Nye concedes the use of federal funds and, as *Shanklin* makes clear, federal funding plus installation of a crossbuck is all that is necessary for preemption under the FRSA. [*Shanklin*], 529 U.S. at 354. It is not a requirement of preemption that the Secretary of Transportation through the FHWA make an adequacy determination as to particular warning devices. *Strozyk* [*v. Norfolk S. Corp.*], 358 F.3d [268,] 275 [(3d. Cir. 2004)]. In essence, the FHWA's approval, albeit tacit approval, is its federal funding of the Ohio Crossbuck Program with funding through the ISTEA. Nye's contentions that preemption does not apply because the sign was experimental or that it was not an improvement project have no impact on the fact that the crossbucks were placed on the Hough Road crossing with federal funds by CSXT railroad in 1995, and that is all that is required for preemption. Finally, Nye's argument against summary judgment on the issue of preemption is unfounded since preemption by the FRSA is purely a question of law. *Tyrrell v. Norfolk S. Ry. Co.*, 248 F.3d 517, 520 (6th Cir. 2001); *GTE Mobilnet v. Johnson*, 111 F.3d 469, 475 (6th Cir. 1997). Therefore, Nye's negligence claim based on inadequate warnings is preempted. *Shanklin*, 529 U.S. at 356.

*Nye*, 437 F.3d at 562–63.

Despite the Sixth Circuit's decision in *Nye* noting that the Ohio Buckeye Crossbuck Program was paid for by federal funds, *id*., the Defendants must provide evidence that the Ulsh Road railroad crossing in Caledonia, Ohio was installed using federal funds. *Byrne*, 541 F. App'x

at 674, 678. The Defendants have provided such evidence and therefore are entitled to summary judgment.

The record establishes that Conrail was one of the railroads that entered into an agreement with the State of Ohio to participate in the Ohio Buckeye Crossbuck Program. (Doc. No. 185-1, pp. 22–43). Ulsh Road was a Conrail crossing at the time of the program, thus receiving federally funded crossbucks.

The Defendants have submitted an Affidavit from Susan Kirkland, the former Manager of the Rail Highway Safety Section of the Ohio Rail Development Commission (ORDC), who administered the Buckeye Crossbuck Program. (Doc. No. 185-1, p. 1). Matthew Downs, an Ohio Department of Transportation (ODOT) employee responsible for federal project accounting, has also filed an affidavit. (Doc. No. 185-2, p. 1). Furthermore, several documents relating to the Ohio Buckeye Crossbuck Program and Conrail's participation in that program have been filed.

The documents include copies of Conrail's bills to ODOT, totaling $892,124.00. (Doc. No. 185-2, p. 2). One of the bills includes an attached list of crossings improved under that bill. (Doc. No. 185-1, pp. 84–85). The Ulsh Road grade crossing was listed as having new crossbucks installed on May 11, 1993. (Doc. No. 185-1, p. 85). There is also an Ohio Buckeye Crossbuck Program installation sheet dated May 11, 1993, for the Ulsh Road grade crossing. (Doc. No. 185-1, p. 68). The installation sheet was the record of installation used by ODOT. (Doc. No. 193-1, pp. 71–75). ODOT records confirm that the Department paid Conrail $892,124.00, using federal funds. (Doc. No. 185-2, p. 2). Thus, the evidence shows that the installation of crossbucks, including those at Ulsh Road, were paid by the ODOT using federal funds.

Plaintiffs assert that Ms. Kirkland lacks sufficient personal knowledge to authenticate the Conrail bills and the Ulsh Road installment sheet. They further contend that there is insufficient evidence that Conrails' bills were submitted or approved by the ORDC. The issue before the Court is whether there is sufficient evidence establishing that the Ulsh Road crossbucks were installed with federal funds. The evidence before the Court is admissible and provides overwhelming proof that federal funding was used in the installation of the crossbucks at Ulsh Road.

The testimony by a witness with knowledge that an "item is what it is claimed to be" satisfies the requirements of authentication. Fed. R. Evid. 901(b)(1). Plaintiffs argue that because Ms. Kirkland cannot recall reviewing the Conrail bills and Ulsh Road installation sheet back in the early 1990s, and because the copies of the bills do not show an ODOT stamp, Ms. Kirkland cannot authenticate the documents. Ms. Kirkland's inability to specifically recall reviewing certain documents twenty years ago does not defeat the documents' admissibility. Ms. Kirkland identified the bills as being those submitted by Conrail for the Buckeye Crossbuck Program and has "absolutely no reason to believe" the bills are not authentic. (Doc. No. 193-1, p. 101). The bills also do not bear the stamp showing they were received by the ODOT. But, according to Ms. Kirkland, they could have been stamped on the backside of the documents. (Doc. No. 193-1, pp. 63–64).

Under the program, Conrail periodically sent progress bills to ODOT. The bills were sent to Jeff Honefanger, the Deputy Director of ODOT's Division of Rail Transportation. (Doc. No. 185-1, p. 1; Doc. No. 193-1, pp. 120–22). When the new crossbucks were installed at the

8

crossing, the railroad would submit an installation sheet to the ODOT. Ms. Kirkland would review the bills and approve them for payment. (Doc. No. 193-1, pp. 118–22 ).

Although she does not have a specific recollection of reviewing the bills in question, Ms. Kirkland agreed the documents "appear to be" the bills submitted by Conrail for the Buckeye Crossbuck Program. (Doc. No. 193-1, p. 98). The bills have the Conrail logo at the top. (Doc. No. 185-1, pp. 70-137). They are addressed to Jeff Honefanger, as would be appropriate under the billing process. (Doc. No. 185-1, pp. 70-137). They also reference the "STATE OF OHIO BUCKEYE CROSSBUCK PROGRAM. AGREEMENT NO. 7262, DATED 12/18/92." (Doc. No. 185-1, pp. 70-137). .

Ms. Kirkland, as the person responsible for the Buckeye Crossbuck Program, has sufficient knowledge to identify the Conrail bills and installation sheet for the Ulsh Road project. There is a rational basis for her claim that the documents are what she asserts them to be. The Court therefore finds the documents are admissible.

The Court further notes that the Conrail bills are self-authenticating under Federal Rule of Evidence 902(7), which provides that no extrinsic evidence of authenticity is needed for evidence bearing "[a]n inscription, sign, tag, or label purporting to have been affixed in the course of business and indicating origin, ownership, or control." The Conrail bills have the Conrail logo, showing they were produced by Conrail. Thus, no further evidence of authentication is required. *Alexander v. CareSource*, 576 F.3d 551, 561 (6th Cir. 2009) (job description generated on defendant's letterhead "contains a trade inscription indicating the source of origin of the document, and it is self-authenticated under Federal Rule of Evidence 907(7)").

9

Plaintiffs' argument that there is insufficient proof that all of the invoices were submitted to ODOT and approved for payment is contrary to the evidence. Ms. Kirkland testified that her normal procedure was to sign what was called an AU–10 form, which signified approval of the bills for payment. She did not see an AU–10 form for Conrail in the documents she reviewed in this case, nor does she have a copy of this form. Plaintiffs claim the absence of the AU–10 form establishes that there is no evidence the bills were approved.

However, Mr. Downs explained in his deposition that the bills were paid, which proves that the bills were approved. (Doc. No.193-5, p. 56). Ms. Kirkland also confirmed that payment of the bills meant that the bills were submitted and approved. Thus, irrespective of whether form AU–10 has been made a part of the record, the fact that ODOT paid the bills proves that the bills were approved as ODOT only paid bills after they had been approved. Given the evidence, the Court finds that federal funds were used to install the Ulsh Road railroad crossing. Because such funds were used, Plaintiffs' inadequate warning claims are preempted and the defendants are entitled to summary judgment as a matter of law. *Byrne*, 541 F. App'x at 674; *Nye*, 437 F.3d at 562–63.

IV.  Conclusion

Accordingly, Defendants' motion for summary judgment (Doc. No. 185) is granted.

IT IS SO ORDERED.

    S/ *David A. Katz*
    DAVID A. KATZ
    U. S. DISTRICT JUDGE